# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**UNITED STATES OF AMERICA,**

**vs.**  Case No. 4:26-mj-14-MAF

**DIEGO MARTIN VILLAVICENCIO,**

    **Defendant.**
_____/

## ORDER OF DETENTION

The Defendant was arrested based on a criminal complaint from this Court, ECF No. 1. Defendant is charged with one count of Interstate Communications of Threats to Injure, in violation of 18 U.S.C § 875(c). The Government moved to detain the Defendant pending trial pursuant to the Bail Reform Act, citing danger to the community and risk of flight. See 18 U.S.C § 3142(f)(1)(A) (crime of violence). A combined preliminary and detention hearing was held on February 17, 2026. The following findings are made:

    1. Defendant exercised his right to a preliminary hearing. Defendant agreed that hearsay was permissible but objected to the Government's sole reliance on the sworn criminal complaint affidavit as evidence, arguing at least one Government witness was required to testify under Rule 5.1. While Defendant is correct that the rule requires a defendant be given the opportunity to present his own evidence and testimony, and

"may cross-examine adverse witnesses," the plain language of the rule does not require the Government to present live testimony or a specific type of evidence to establish probable cause.[1] See Fed. R. Crim. P. 5.1(e). A preliminary hearing is not a trial. Defendant's objection is overruled. After consideration of the sworn criminal complaint affidavit,[2] and the arguments of counsel, there is probable cause to believe Defendant committed the offense as charged in the criminal complaint, ECF No. 1.

1.   The weight of the evidence as presented by proffer and the Government's exhibits is strong. Although the weight of the evidence has been considered as required by § 3142(g)(2), it is not a primary factor as the Defendant is presumed innocent.

---

[1] The one case Defendant provided in support of his argument was United States v. Perez, 17 F. Supp. 3d 586 (S.D. Tex. 2014), an order discussing the evidence presented by the parties at a Rule 5.1 preliminary hearing. There, the government chose to only present a live witness, whose testimony the magistrate judge described as "second-hand hearsay" and "barebones," yet was still sufficient for probable cause Id. at 595-96. The judge noted that, "as a matter of general practice, the government will attempt to meet its [evidentiary] burden by summarizing the evidence against the accused…through the testimony of a case agent or investigator." Id. at 594. Nowhere does the order suggest, insinuate, or find that the Government was *required* to produce a live witness. In fact, the order showcases the limited value witness testimony often has at this stage, where hearsay is permissible and the rules of evidence do not apply. See Fed. R. Evid. 1101(d); see also United States v. Tuell, No. 24-MJ-00147-JFJ-1, 2024 WL 1333045, at *1–3 (N.D. Okla. Mar. 27, 2024) (denying motion to compel the government to present live witness testimony at preliminary hearing); United States v. Carino, No. CR 2016-0008, 2016 WL 6023099, at *4–5 (D.V.I. Oct. 13, 2016), aff'd, 787 F. App'x 113 (3d Cir. 2019) (government's reliance on affidavit was sufficient and live witness was not required for probable cause).

[2] The Government submitted a redacted copy of the affidavit, ECF No. 13, which removes the victim's names. The Court has reviewed the unredacted version, ECF No. 2, which remains sealed.

2. This is not a rebuttable presumption case. It is the Government's burden to put forth clear and convincing evidence that Defendant is a danger to the community and/or a preponderance of evidence that Defendant is a risk of flight, such that no conditions of release could reasonably assure community safety or Defendant's appearance as required. The Government presented no evidence that Defendant was a risk of flight and conceded Defendant had not fled despite being under law enforcement surveillance for some time. The pretrial services report indicated Defendant has $15,000 in a bank account, but that alone is not a sufficient risk of flight. The Government did not meet its burden to show risk of flight or non-appearance. Therefore, the remaining discussion relates to the Court's ultimate finding of danger to the community.

3. Defendant requested release pending trial. He lives in Tallahassee with his long-time partner, Ms. Trammell, and their six-year-old child. After he was laid off in October 2025, he took over the stay-at-home parent role while Ms. Trammell is at work. They do not travel often. Defendant's passport is expired. Defendant was open to conditions of release like a GPS monitor and internet restrictions. Ms. Trammell testified that Defendant has never been violent toward her or their child and she has no concerns that he would exhibit violence toward anyone else.

4. The Court gives little credit to Ms. Trammell's lack of concern. The totality of the evidence, as discussed below, objectively demonstrates Defendant's concerning pattern of violence, instability, and dangerous behavior.

5. Defendant is charged with publicly posting several threats to kill Public Figure 1 (PF1) in September 2025. Defendant has made additional threats to kill a member of Congress (PF2), and other threats to kill President Donald Trump and Former President Joe Biden, between September 2025 and January 2026. Defendant previously made similar threats against PF1 in 2021 but was not charged.

6. Defendant's threatening posts began on X (formerly known as Twitter). On September 12, 2025, he posted he was "going to shoot" PF1. Three days later, he posted two photos of PF1 with a red sight and crosshairs overlayed on PF1's head. The first stated "[PF1] will be shot and killed September 23" and the second stated "[PF1's] next." The next day Defendant directed his ire at PF2, responding to PF2's public post with a threat that Defendant would "kill you and your family and you won't do anything about it." Defendant also directly messaged PF2 on X, saying "you are going to be shot and killed on September 24."

7. Defendant's posting continued in October 2025 with a more

general threat, expressing sentiments of "Death to America," "Bomb America," "Bomb the federal reserve," "Kill politicians," "Kill CEOs," "Shoot Joe Biden," "Shoot PF1," "Shoot Donald Trump," "End capitalism," "Free the people." (collectively referred to as "general threat"). On another occasion, Defendant posted a still photo of the assassination of Charlie Kirk and stated: "Political violence is the only language plutocrats understand. I'll be killing soon also." Defendant's X account was suspended in November 2025.

8. The suspension did not stop Defendant, who then turned to the online platform 4chan, which lets users post under anonymous usernames. Defendant posted the same October 2025 general threat from X to 4chan on November 13, 2025 and December 8, 2025. On November 20, 2025 he posted a similar comment, with the addition that he was "going to shoot PF1 tomorrow and Donald Trump."

9. On January 26, 2026, Defendant responded to a 4chan user's post about a cryptocurrency event being held at Mar-a-Lago on February 18, 2026. Defendant stated "good, I'll be driving there to take a couple shots at Trump and some of the other corrupt plutocrats," followed by his often used general threat.

10. Defendant was arrested on the criminal complaint on February 16, 2026—two days before the Mar-a-Lago event. At the time of the arrest,

Defendant was driving his vehicle. A search of the vehicle recovered a very large machete and a disturbing mask. A photo of these items is in evidence.

11. Defendant has been the subject of numerous criminal investigations dating back to his early youth. At ages thirteen, fifteen, and nineteen, Defendant was investigated for six sexual assaults of different minors. He was ultimately charged with only one when he was nineteen and agreed to a plea deal on a lesser charge of child abuse. Defendant continued to contact the victim despite the no-contact order.

12. Defendant attended college at the University of Central Florida. His time there was fraught with instances of threats and violence against others. In 2015, after he was confronted about bumping into another student on campus, he pulled a pocketknife and threated the student to not "mess with him." He later admitted to police that he got rid of the knife so it couldn't be found. The charges were subsequently dropped. In April 2017, teaching staff reported Defendant after he lashed out when they asked him for his ID card. UCF initiated a student conduct proceeding but Defendant did not make himself available until several years later via video call, in April 2021. During the call, Defendant displayed hostile and agitated behavior. Multiple times he turned the camera toward what looked like an automatic rifle. On June 9, 2021, Defendant emailed one of the student conduct officials that "if

my diploma isn't sent to me by June 15 your entire world is going to get rocked." The next day, he showed up to the student conduct office yelling, agitated, and asking for a specific staff member. He then screamed at the staff member and threated him to "be careful." The day after that, police contacted Ms. Trammell and Defendant. Ms. Trammell told the officer that it was "not right what UCF and society is doing to us." Defendant later yelled, threatened, and cursed the officer on the phone.

13. Based on the incidents at UCF, a risk protection order was granted against Defendant in 2021. Defendant's mother wrote a statement in support of the petition. She indicated Defendant had a prolonged mental health history with a refusal to seek treatment. She traced a large part of his struggles to anger, paranoia, and a belief that the world was out to get him.

14. Around the same time, the FBI contacted Defendant to speak with him about threats against PF1 they believed Defendant was posting on 4chan. Defendant was anxious, upset, and not cooperative. No charges were filed.

15. Defendant has shown an inability or unwillingness to control his actions. When faced with even the most innocuous request, such as presenting identification, he has lashed out in anger at others. When confronted for bumping into someone, he admitted to pulling a knife on the

person and disposing of the evidence. When faced with student conduct proceedings which threatened his diploma, he dialed up his outrage and threats—showing what looked like an assault rifle, emailing threats and obscenities, and causing an intimidating scene on campus. And instead of putting a stop to his threats against PF1 after he was confronted by the FBI about it, he has continued to threaten PF1's life as well as the lives of multiple other public figures and their family members, going so far as to give specific dates and at least one specific event only hours away from Defendant's home. When law enforcement arrested Defendant two days before that event, he was found with a machete and a mask in his car. While not required for these charges, Defendant certainly had the ability to inflict great harm.

16.   It is true that Defendant is only charged with making threats, not carrying them out. But words matter. Beyond causing fear of harm to those who are threatened, threats can inspire, inflame, or entice others to act, whether it be in support of shared beliefs or for their own cause. The dangerous nature of public threats to harm political figures, especially in today's climate, cannot be understated. Society is not required to wait until a bomb goes off to act. Defendant appears to be a ticking time bomb. No conditions of release could eliminate that risk of danger.

17.   For the reasons discussed, the Court finds by clear and

convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community if Defendant were released prior to trial. The Government has met its burden as to danger to the community and the motion for detention is **GRANTED**.

Accordingly, it is **ORDERED** that Defendant is committed to the custody of the Attorney General or her designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant shall be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

**DONE AND ORDERED** on February 18, 2026.

<u>s/   Martin A. Fitzpatrick</u>
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

4:26-mj-14-MAF