**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA**

**v.** **DOCKET NO.: 4:26-cr-00016-AW**

**DIEGO VILLAVICENCIO,**
**DEFENDANT.**
______________________________/

**DIEGO VILLAVICENCIO'S SENTENCING MEMORANDUM**

COMES NOW the Defendant, Diego Villavicencio, by and through the undersigned counsel and submits this Sentencing Memorandum and states as follows:

**1)** In *United States v. Talley*, 431 F.3d 784 (11th Cir. 2005), the Eleventh Circuit adopted a two-step procedure that district courts should follow in imposing sentences after *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). First, the district court must consult the Guidelines and correctly calculate the range provided by the Guidelines. *Talley*, 431 F.3d at 786 (citation omitted). Second, the district court must consider several factors to determine a reasonable sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9)

the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. *Id*. See also 18 U.S.C. § 3553(a).

**2)** *Booker* rendered the Sentencing Guidelines advisory, 543 U.S., at 245, 125 S. Ct. 738, 160 L. Ed. 2d 621, and it preserved a key role for the Sentencing Commission. *Kimbrough v. United States*, 552 U.S. ___, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007). The Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id. quoting Rita v. United States*, 551 U.S. ___, 127 S.Ct. 2456, 168 L. Ed. 2d 203. The sentencing judge, on the other hand, is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." *Id. quoting Gall v. United States*, *ante* at ____, 128 S. Ct. 586, 169 L. Ed. 2d, at 458 (internal quotation marks omitted). A district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply." *Id. quoting Rita v. United States*, 551 U.S.at ___, 127 S.Ct. 2456, 168 L. Ed. 2d 210.

**3)** Mr. Villavicencio, through Counsel, wishes to bring several factors to the Court's attention in consideration of fashioning a fair and just sentence. They are:

**Mr. Villavicencio's abuse and post-traumatic stress**

The abuse Mr. Villavicencio suffered is not routine or run of the mill. He has suffered deeply from physical, verbal and emotional abuse. So much so that he has tried on at least one occasion to take his own life. Listening to Mr. Villavicencio recollect his childhood memories is awful, but it provides a very good explanation of how he got to where he is today.

It is somewhat awkward that Mr. Villavicencio's father, an abuser, is now an advocate for Mr. Villavicencio. His letter on behalf of Mr. Villavicencio is attached.

**Mr. Villavicencio's Mental Health**

> Schizoaffective disorder is a mental health condition that is marked by a mix of schizophrenia symptoms, such as hallucinations and delusions, and mood disorder symptoms, such as depression, mania and a milder form of mania called hypomania. Hallucinations involve seeing things or hearing voices that others don't observe. Delusions involve believing things that are not real or not true.
>
> The two types of schizoaffective disorder — both of which include some symptoms of schizophrenia — are:
>
> Bipolar type, which includes bouts of hypomania or mania and sometimes major depression.
>
> Depressive type, which includes only major depressive bouts. Schizoaffective disorder may affect people differently.
>
> Schizoaffective disorder changes how people think, feel and act. When it isn't treated, the condition can make it hard to function at work or school or in social settings. It also can cause loneliness. People with schizoaffective disorder may need help and support to live their daily lives. Treatment can help manage symptoms and make quality of life better.

https://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/symptoms-causes/syc-20354504

The average age for onset of Schizoaffective disorder and/or Schizophrenia is between 25 and 27 years of age. Li R, Ma X, Wang G, Yang J, Wang C. *Why sex differences in schizophrenia?* J Transl Neurosci (Beijing). 2016 Sep;1(1):37-42. PMID: 29152382; PMCID: PMC5688947.

Mr. Villavicencio's criminal conduct in this case as well as the other documented outbursts directly correlate with major stress factors in Mr. Villavicencio's life. He self-reports that in each instance of threatening outbursts he has felt overwhelmed and incapable of dealing with his life circumstances and that the online posts were almost like a pressure release valve. He expresses that he did not intend physical harm to anyone.

Importantly, Mr. Villavicencio demonstrates situational awareness and that he is cognizant that his behavior is not acceptable (criminal) and he may not re-engage in the same behavior or similar behavior. He is also amenable to therapy as well as taking medications as prescribed.

Mr. Villavicencio's pursuit of mental health treatment has been fraught with impediments and false starts. He has essentially been undiagnosed and untreated until this point. He has had some idea of his condition, and he has started the path for treatment, but those efforts have been thwarted by job loss, insurance loss, relocation and financial difficulties.

Dr. Martin Falb's curriculum vitae and Summary are attached hereto for the Court's consideration.

**Mr. Villavicencio's criminal history**

**The child abuse (¶69 of PSR)**

The only criminal history Mr. Villavicencio really has is a child abuse offense from 2008 when Mr. Villavicencio was 18. This offense is referred to in some places as a sex offense because Mr. Villavicencio was initially arrested for a sex offense. However, the underlying factual circumstances resulted in the lessening of the nature and degree of the offense. Factually, Mr. Villavicencio was a senior in high school who started dating a sophomore in high school. Their relationship became sexual in nature and the father of the young lady took exception and that is what initiated the case.

Mr. Villavicencio completed the terms and conditions of his supervision. There was a violation that was minor in nature and Mr. Villavicencio completed an even more rigorous level of supervision (community control).

**The aggravated assault (¶77 of PSR)**

Mr. Villavicencio has been adamant that this offense was dismissed because his behavior was found to be justifiable self-defense. The other student was eventually subject to discipline by the university.

**The UCF incident and risk protection order (¶¶ 78 and 79 of PSR)**

This circumstance is tied to Mr. Villavicencio's belief that UCF was going to deny him his diploma after many years of hard work. The item that appeared to be a gun in the video was a toy.

**Prior and current threats (¶¶ 65, 66, 67 of PSR)**

The FBI made contact with Mr. Villavicencio with respect to perceived threats he was making in 2021. Mr. Villavicencio was deemed not to be a threat. Similarly, the conduct in Counts 1, 2 and 3 occurred in September and October of 2025. Either the government intended to take no action or did not believe action was required until Mr. Villavicencio made the statements contained in Count 4.

**Mr. Villavicencio took no action in preparation or furtherance**

It is of some significance that Mr. Villavicencio's threats all involve either direct or veiled threats of harm or death resulting from gunshots. Importantly, Mr. Villavicencio does not own any firearms or have access to firearms. Law enforcement's search of Mr. Villavicencio's property and belongings revealed no firearms or ammunition. Mr. Villavicencio has not endeavored to purchase firearms or ammunition. There are significant time periods that lapse after Mr. Villavicencio's threats where no action or activity occurs after.

Mr. Villavicencio is not a member of, or affiliated with, any clubs, gangs or groups typically associated with hate speech or violent political activity.

**Mr. Villavicencio's unique family environment**

Mr. Villavicencio used his time after being laid off from his most recent employment to tend to his son, Virgil's, needs. More specifically, Mr. Villavicencio became the household educator and tutor. He is integrally involved in the family and the life of his child. Mr. Villavicencio's absence creates a significant gap in the family unit financially as well.

**Mr. Villavicencio's education and work history**

Mr. Villavicencio is a well-educated and intelligent person. It is somewhat laudable that he has sought to better and further himself in the face of very difficult circumstances. His area of study and his employment evidence that he is a bright person who is quite capable.

Mr. Villavicencio has had a good work history at a good wage-earning rate. He has been in positions of trust as well. He is very well positioned to be a proactive and positive participant in the work force and society.

**Character Letters**

Letter and picture from son
Letter from father

**WHEREFORE**, Mr. Villavicencio prays this Court will consider the above-mentioned information in arriving at an appropriate sentence and final disposition.

Respectfully submitted,

*/s/ Robert A. Morris*

Robert A. Morris, Esq.
Fla. Bar ID No.: 0144680
The Law Offices of Robert A. Morris, LLC
1020 E. Lafayette St.
Ste. 112
Tallahassee, Florida 32301
Telephone No.: (850) 792-1111
alex@ramlawyer.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic delivery on this 19th day of July, 2026, to Eric Welch, Assistant United States Attorney at eric.welch@usdoj.gov.

*/s/ Robert A. Morris*

Robert A. Morris, Esq.

# Curriculum Vitae

**MARTIN E. FALB, Ph.D.** **FL Lic. #PY5471**

**Addresses**

511 Middlebrooks Circle
Tallahassee, Florida 32312

## Personal Data

Birthplace: Phoenix, AZ
Citizenship: U.S.
Birthdate: 3/20/52

## Academic Preparation

August 1995 — Doctorate Awarded in Counseling Psychology and Human Systems
Department of Human Services and Studies
Florida State University, Tallahassee, Florida 32306

Dissertation Topic: Psychological hardiness as a predictor of academic performance, stress appraisal, and health status of community college transfer students
Major Professor: Stephen A. Rollin, Ed.D.

Comprehensive Examination: Passed, February 1993

Areas of Concentration: Health Psychology-Stress management ; Behavioral Medicine-pain management, psychological hardiness as a moderating variable; substance abuse education; psychological evaluation; treatment of adolescents

August 1978 to Dec. 1982 — Master of Music, Music Therapy Department
Florida State University, Tallahassee, FL 32306
Major Professor: Jayne Standley, Ph.D.
Thesis Title: The Use of Operant Procedures to Condition Vasoconstriction in Profoundly Mentally Retarded Children
Honors: Pi Kappa Lambda, National Graduate Music Honor Society

August 1977 to June 1978 — Bachelor of Arts
Central Washington University
Ellensburg, WA
Major: Psychology Minor: Music

Sept. 1970 to April 1974 — Attended Colgate University
Hamilton, NY

## Current Employment

Sept. 1996 to present — Private Practice; Licensed Psychologist in State of Florida: # PY5471

March 2, 2000 To present — General psychology private practice with specialties in Forensic, Corrections, Geriatric, and Sexually Violent Predator evaluations (currently under contract with State of Florida Department of Children & Families Sexually Violent Predator Program). Also provide Psychosexual Risk Assessments, Competency Evaluations for the Court (2nd & 3rd Jud. Circuits), and in-facility psychology consultation for private as well as State of Florida correctional healthcare.
.

## Past Employment

April 9,1999 to March 2001 — Licensed clinical faculty holding a Senior Psychologist F/C position in 100-bed **Forensic Admissions** unit at Florida State Hospital, Chattahoochee, FL. Primary responsibility for initial clinical assessment and subsequent competency evaluation to return residents to court. Psychological testing and evaluation as required as well as mandated court reports. Member of multidisciplinary Service Implementation Plan team. Served as Chairperson for Psychology Department Clinical Faculty Committee (1999-2000). Supervisor of psychology interns at an APA-accredited psychology internship.

Sept. 5, 1996 to April 9,1999 — Licensed clinical faculty holding a Senior Psychologist position in a 90-bed Geropsychiatric, inpatient state institution. Primary therapist for 30-bed admission/discharge ward, responsible for 72-hour initial psychology assessment, substance abuse screening, and follow-up 30-day comprehensive psychology evaluation. Member of multidisciplinary Service Planning Team. Supervisor of psychology interns at our APA-accredited psychology internship. Also responsible for court documentation and reports (competency evals and clinical summaries) regarding status of **geriatric forensic residents.** Lead therapist for task-oriented, reality based morning group, as well as regularly scheduled individual therapy sessions. Patient population comprised of large percentage of dementia and pseudodementia diagnoses.

## Additional Employment

January 2002 to Nov2022 — Contracted by CoreCivic as Senior Psychologist to provide supervisory and consultative services to private correctional facilities in Lake City, FL. Evaluations include sex offender screenings, mental status evaluations, and parole evaluations.

March 2000 to present — Contracted by Sexually Violent Predator Program (Tallahassee, FL) as a provider to conduct Sexually Violent Predator Evaluations as mandated by the Sexually Violent Predator (Jimmy Ryce) Act.

August 1996 to Dec.1999 — Employed by MHM Services as a consultant and provider of on-site behavioral health services to the elderly in the community. Service provision includes: comprehensive neurobehavioral status exams, psychological testing, and individual therapy.

## Professional Affiliations and Licenses

Florida Licensed Psychologist #PY5471

## Supervised Clinical Experience

Sept. 1995 to Sept. 1996 — Psychological Resident
Florida State Hospital
Chattahoochee, FL 32324-1000
Duties and responsibilities: Diagnosis, evaluation, and treatment on a 30-bed, inpatient Geropsychiatric unit. Treatment included individual/ group psychotherapy, and psychoeducational groups. Member of multidisciplinary treatment team responsible for all residents' comprehensive individual treatment plan (CITP). Responsible for **forensic competency evaluations and subsequent competency training.** Also performed consultation and clinical assessment on Alzheimer's Unit.
Primary Supervisor: Glee R. Hollander, Ph.D.

Sept. 1994 to August 1995 — Psychology Intern
Florida State Hospital
Chattahoochee, FL 32324-1000
Duties and responsibilities: Combined track (Civil and Forensic) APA-credentialed internship, 2000 hours. Three major rotations including Geriatric and Alzheimer's units, Social Learning Program, and Forensic Admissions. Treatment modalities included long-term individual psychotherapy, group psychotherapy, token economy and step system. Psychological evaluation including neuropsychological assessment and competency to proceed.
Director of Clinical Training: Ellen Resch, Ph.D.

March 1993 to August 1994 — Mental Health Specialist
Tallahassee/Leon County Human Services Center
Tallahassee, FL 32304

Duties and responsibilities: Outpatient based assessment and therapy with primarily adolescent population. Client population included a variety of developmental, mood, and personality disorders. Complete

evaluations performed to assess intellectual, cognitive, achievement, and behavioral strengths/weaknesses of juvenile offenders. Therapy experience included group, individual and family, utilizing an eclectic approach. Member of interdisciplinary treatment team to facilitate case staffings and recommend subsequent treatment interventions. Administrative and member responsibilities as intake coordinator for Family Services Planning Team, a community-based body utilized for intensive treatment intervention. (40 hrs./wk-estimate 2720 hrs.)
Supervisor: Robin D. McCallister, Ph.D.

Jan. 1992 to April 1992

Psychology Trainee
Florida State University Career Counseling Center
Tallahassee, FL 32306
Duties and responsibilities: Outpatient based assessment and therapy with adult and adolescent populations. Complete assessments performed to assist individuals in developing clear perspective of career needs and goals, self-assessment, and decision-making. Therapy experience included group and individual, utilizing an information processing approach. (9 hrs./wk-estimate 300 hrs.)
Supervisor: Gary W. Peterson, Ph.D.

Aug. 1991 to April 1992

Graduate Assistant
Regional Multidisciplinary Center
Florida State University, Tallahassee, FL
Duties and responsibilities: Responsible for intellectual, achievement, behavioral and emotional assessment and testing of adult, child and adolescent regional school referrals. Utilized WAIS-R, WISC-III, Woodcock-Johnson, CAT, TAT, Stanford-Binet, Achenbach, and other standardized test materials. Responsible for complete written evaluation and feedback follow-up for each case.(12 hrs./wk-estimate 100 hrs.)
Supervisors: Beverly Atkinson, Ph.D. and Anne Selvey, Ph.D.

August 1991 to December 1991

Psychology Trainee
Florida State University Career Counseling Center
Tallahassee, FL 32306
Duties and responsibilities: Outpatient based assessment and therapy with adult and adolescent populations. Complete assessments performed to assist individuals in developing clear perspective of career needs and goals, self-assessment, and decision-making. Therapy experience included group and individual, utilizing an information processing approach. (9 hrs./wk-estimate300 hrs.)
Supervisor: James P. Sampson, Ph.D.

Jan. 1991 to April 1991

Psychology Trainee
Florida State University Human Services Clinic
Tallahassee, FL 32306
Duties and responsibilities: Assessment of and therapy with adult and adolescent outpatient populations with a range of presenting problems including mood, anxiety, developmental, and personality disorders. Assessment instruments used included the MMPI, WAIS-R, Beck Depression Inventory, along with intake interviews. Therapy was mainly individual and utilized an eclectic approach. (10 hrs./wk-estimate 300 hrs.)
Supervisor: Deborah Ebener, Ph.D.

August 1990 to December 1990

Psychology Trainee
Florida State University Human Services Clinic
Tallahassee, FL 32306
Duties and responsibilities: Assessment of and therapy with adult and adolescent outpatient populations with a range of presenting problems including mood, anxiety, developmental, and personality disorders. Assessment instruments used included the MMPI, WAIS-R, Beck Depression Inventory, along with intake interviews. Therapy was mainly individual and utilized an eclectic approach.
(10 hrs./wk-estimate 300 hrs.)
Supervisor: William English, Ph.D.

Dec. 1990 to Dec. 1992

Certified Biofeedback Practitioner/ Counselor
South Georgia Neurological Institute
Thomasville, GA
Duties and responsibilities: one-to-one outpatient adult evaluation/assessment, treatment and case management utilizing eclectic counseling approach and biofeedback as primary modalities of intervention. Use of EMG, EDG, skin temperature training strategies. Also provided didactic groups for pain management program. Member of multidisciplinary treatment team. (20 hrs./wk-estimate 1000 hrs.)
Supervisor: T. Wayne Conger, Ph.D., ABPP

## Other Related Experience

Jan.1993 April 1993

Graduate Assistant/ Internship Coordinator
Department of Human Services and Studies
Florida State University, Tallahassee, FL
Duties and responsibilities: Conducted group supervision for masters level counseling interns. Administrative duties included evaluation of interns= progress integrated with progress reports from site supervisors. Liaison between internship site and Human Services and Studies program faculty.
Supervisor: Deborah Ebener, Ph.D.

| | |
|---|---|
| Feb. 1990<br>to Oct. 1990 | Music Therapist<br>Southwestern State Hospital<br>Thomasville, GA<br>Duties and responsibilities: Group therapy leader, one-to-one adult patient case management and treatment utilizing music therapy as primary modality. Documentation of patient progress for acute, in-patient, psychiatric population.<br>Supervisor: Marcus Smith |
| June 1989 to<br>February 1990 | Behavior Program Specialist<br>State of Florida, Department of Health and Rehabilitative Services<br>Developmental Services<br>Tallahassee, FL<br>Duties and responsibilities: In-home behavior programming that included designing behavior management programs for assigned clients consisting of adult, adolescent, and child populations; monitor program implementation and progress and provide follow-up as needed.<br>Supervisor: Pat Thomas |
| Nov.1985<br>to June 1989 | Psychiatric Rehabilitation Therapist<br>Department of Psychiatry, Sarasota Memorial Hospital<br>Sarasota, FL<br>Duties and responsibilities: Planned, developed and implemented a variety of music and recreational programs for acute/intermediate adolescent, adult and geriatric psychiatric patients. Member of multi-disciplinary treatment staffings, documentation of patients' progress, biofeedback therapy evaluation and case management.<br>Supervisor: Deborah-An Morrill |
| May 1984 to<br>November 1985 | Rehabilitation Therapy Program Supervisor<br>G. Pierce Wood Memorial Hospital<br>Arcadia, FL<br>Duties and responsibilities: Design and implementation of a wide variety of music therapy groups and programs for adult and geriatric psychiatric in-patient population at large, state facility. Supervision and evaluation of staff.<br>Supervisor: Ben Carleton, Ph.D. |
| October 1982<br>to May 1984 | Music Therapist<br>Southern Virginia Mental Health Institute, Danville, VA<br>Duties and responsibilities: Designed and implemented wide variety of music therapy and recreational programs for acute/intermediate adolescent, adult, and geriatric psychiatric patients. Member of multi-disciplinary treatment team, responsible for participation in |

clinical staffings, documentation of patient participation and progress in treatment programs.
Supervisor: Glenn Jones

## Teaching Experience

| | |
|---|---|
| August 1990 to Dec. 1990 | Communications and Human Relations<br>Undergraduate Level Course<br>Department of Human Services and Studies<br>Florida State University, Tallahassee, FL |

## Research

| | |
|---|---|
| Aug. 1992 to June 1995 | Dissertation, defended June 28, 1995.<br>This study used a regression model of analysis to investigate the relationships between community college students and level of ability to moderate the impact of academic as well as personal stressors and the outcome on their grade-point average, self-report of somatic symptoms, and stress appraisal. |
| May 1990 to July 1991 | Research Assistant<br>Florida State University Center for Policy Studies and Research<br>Tallahassee, FL 32306<br>Duties and responsibilities: Worked 20 hrs./week on federally-funded grant from U.S. Department of Education, supervised by Dr. Steve Rollin. Performed literature search, developed programming materials, administered assessments, facilitated data analysis and provided parental and student didactic instruction for Project K.I.C.K., a school-based drug education research project.<br>Principal Investigator: Stephen A. Rollin, Ed.D. |

## Presentations

| | |
|---|---|
| August 1991 | Paper presented at the annual meeting of the American Psychological Association in San Francisco, CA: A Preliminary Report of a School-Based Drug Education Research Project. |
| April 1981 | Southeastern Conference of the National Association for Music Therapy Annual Conference in Nashville, Tennessee. Title: Physiological Measurement as an Indicator of Sensory Mode Reception in the Profoundly Mentally Retarded (PMR) Client. |

## Workshops Attended

Oct. 17-18, 2018 — Association for the Treatment of Sexual Abusers (ATSA): 2018 National Conference, Vancouver, B.C. Addressing Bias: Toward More Objective, Accurate Assessments of Sexual Offenders; Deepening Our Understanding of Dynamic Risk: Theory And Practice; Long-Term Follow-up of Sexual Offenders on Community Supervision. Various Presenters.

April 20-21, 2018 — 2018 SVPP Evaluator Training & Workshop: Stable-2007 Training; Exploring the Psychological Meaning of Sexual Recidivism Risk Factors: Recent Research on Risk Dimensions and Related Constructs; New Predictors of Sex Offender Risk; The Use of Hebephilia and Paraphilia Non-Consent in Sexually Violent Predator Evaluations.
Various Presenters, Tallahassee, Florida.

April 27-28, 2017 — 2017 SVPP Evaluator Training & Workshop: Re-evaluating the SVPP Recidivism Data; Forensic Report Writing for SVPP Reports; Virginia SVP; 2016 Static-99 Scoring Updates; Value of Protective Factors for SVP Programs; Interviewing the Predator, the Triad Approach and Sexual Deviancy.
Various Presenters, Tallahassee, Florida.

April 21-22, 2016 — 2016 SVPP Evaluator Training & Workshop: Overview of Conditional Release/Supervision Settings for Sex Offenders; Testifying In Court; Issues In Law & Ethics; Frye/Daubert and Related Issues in Florida and Other States; Legal Updates in Minnesota, Missouri, & Texas Rulings; Updates in CTP at FCCC.
Various Presenters, Tallahassee, Florida.

Sept. 29-30, 2014 — 2014 SVPP Evaluator Training & Workshop: SVPP Update-Statutory Changes, Case Law, and Recidivism Study; Florida and National Sex Offender Recidivism; Current Perspectives on Assessment, Risk, and Reintegration. Various Presenters, Tallahassee, Florida.

June 13-14, 2013 — 2013 SVPP Evaluator Training & Workshop. DSM-V, Abel Screening Assessments. Various Presenters, Tallahassee, Florida.

March 13, 2013 — 2013 Training on DSM-V, conducted at Holiday Inn, Apalachee Parkway, Tallahassee, FL.

July 12-14, 20122012 SVPP Evaluator Training & Workshop. Annual Reviews, FCCC CTP, and Dangerousness. Various Presenters, Tallahassee, Florida.

Sept. 22-23, 2011 2011 SVPP Evaluator Training & Workshop. Risk Assessment, Diagnostic Issues, and Dangerousness. Presenter: Dr. Dan Montaldi. FCCC, Arcadia, Florida.

June 2-4, 2011 2011 SVPP Evaluator Training & Workshop. Risk Assessment I, II, III: Static 99 & Structured Risk Assessment. Presenter(s): Dr. David Thornton and Dr. Deidre D'Orazio. Tallahassee, FL.

February 26, 2011 DSM Diagnosis in Clinical Practice: Current Principles and a Preview of Coming attractions (DSM-5). Presenter: Dr. Michael B. First. Ft. Myers, FL.

June 11-12, 2010 2010 SVPP Evaluator Training & Workshop. Provided by Florida Dept. of Children & Families, Tallahassee, FL.

October 23, 2009 Training On Domestic Violence, Marguerite Jackson, MSW, LCSW; Errors Workshp. For Non-medical, Mental Health Providers, Robert Porter, Ph.D.; Florida Laws, Rules, and Ethics, Connie Galietti, J.D.

June 15-16, 2009 Assessing Psychopathy With The PCL-R. Specialized Training Services, Inc. San Diego, CA.

February 4-5, 2009 Dynamic Supervision of Sexual Offenders. Florida Dept. Of Children & Families Sexually Violent Predator Program.

March 29, 2008 Adult Risk Assessment of Sexual Abusers. Florida Assoc. For The Treatment Of Sexual Abusers.

March 27-28, 2008 Preventing Sexual Abuse: Advances In The Evaluation & Treatment Of Youthful & Adult Sexual Abusers. Florida Assoc. For The Treatment Of Sexual Abusers.

February 29, 2008 Introduction to the NEPSY-II: Applications and Implications. Florida Psychological Association. David M. Schwartz, Ph.D.

January 25, 2008 Preventing Medical Errors For Behavioral Healthcare Practitioners. Florida Psychological Association. Genie Skypek, Ph.D., Presenter.

Dec. 7, 2007 Domestic Violence: Suicide Vs. Homicide-A Case Study Florida Psychological Association. Jill Ricke, Ph.D. and Don Pumphrey, Jr., J.D., Presenters

Dec. 7, 2007 Florida Laws, Rules and Ethics. Florida Psychological Association. Connie Galietti, J.D., Presenter.

Dec. 8-10, 2006 On the Witness Stand: Coping With Aggressive Cross-Examination. Assessment of Malingered Cognitive Impairment. Recent Development In MMPI-2 Interpretation: New Scales and Multicultural Applications An Update On Violence Risk Assessment For Mental Health Professionals.
Florida Psychological Association.

Oct. 19, 2006 Florida's Regulations for Psychologist: An Overview of Statutory and Regulatory Changes That Affect Psychological Practice.
Florida Psychological Association.

Aug. 16, 2006 Alzheimer's, Dementia, & Parkinson's. Institute For Natural Resources.

July 15-16, 2006Assessment and Treatment of People Who Have Been Convicted Of Sex Offenses: Part I & II. Juvenile Sex Offenders.
Florida Psychological Association.

Jan. 27-28, 2005 Sex Offenders and Victims. Specialized Training Services, Inc. Anna Salter, Ph.D., Presenter.
Jan. 26, 2005 Sex Offenders and the Internet. Specialized Training Services, Inc. Robert Farley, M.S., Presenter.

Feb. 19-20, 2004 Issues in Supervision. Course provided by Program Services in Miami, FL, to qualify as multidisciplinary internship supervisor.
Oct. 17-18, 2003 The Sexual Exploitation of Children; Multidisciplinary Investigative Perspectives on Sexual Violence. Presented by FPA.

Oct. 28-29, 2002 Violence Risk and Threat Assessment by Reid Meloy, Ph.D.
Ft. Lauderdale, Florida

Sept. 26-27, 2002 Civil Commitment of the Sexually Violent Predator
Sponsored by the Florida Prosecuting Attorneys Assoc.,
Sarasota, Florida

October 3-5, 2001 Civil Commitment of the Sexually Violent Predator.
Sponsored by the Florida Prosecuting Attorneys Association
Sarasota, Florida

August 9-10, 2001 Selected Issues in the Treatment of the Sexually Violent Predator
By Ted Shaw, Ph.D., Alvin Butler, MSCP, Michael Lipscomb, Ph.D., Clinton Rhyne, Ph.D., Astrid Hall, Dr.S., and Carolyn Stimel, Ph.D., ABPP.

| | |
|---|---|
| February 8-9, 2001 | Selected Issues in Sexually Violent Predator Assessment and Testimony by Dennis Doren, Ph.D., DABPS, ABAP and Phillip Havens, Esquire; Orlando, Florida. |
| Oct. 12-13, 2000 | The Assessment of the Sexually Violent Predator Using the Minnesota Sex Offender Screening Tool-Revised by Douglas Epperson, Ph.D.; Orlando, Florida. |
| July 27-28, 2000 | Civil Commitment of the Sexually Violent Predator Sponsored by the Florida Prosecuting Attorneys Association Orlando, Florida |
| March 8-9, 2000 | The Sexually Violent Offender by Roy Hazlewood,(FBI, Ret.), Jacksonville, Florida. |
| February 25, 2000 | Guidelines For Completing Sexually Violent Predator Civil Commitment Evaluations by Amy Phenix, Ph.D.; Orlando, Florida |
| January 28, 2000 | Sexually Violent Predator Evaluator Workshop Sponsored by The Department of Children & Families Tallahassee, Florida |

## **References**

Greg Prichard, Psy.D.
Licensed Psychologist
Bristol, FL 32324
#(850) 643-1151

Sal Blandino, Ph.D.
Licensed Psychologist
1640 Metropolitan Circle,
Suite #2
Tallahassee, FL 32308
(850) 556-3882

Jorey L. Krawczyn, Ed.D.
731 A Airport Road
Panama City, FL 32405
(850) 832-2447

William E. Oglesby, Psy.D.
Licensed Psychologist
Deputy Director, San Bernardino
County, Dept. of Behavioral
Health
(334) 618-5715

# MARTIN E. FALB, Ph.D., P.A.

*Forensic & Geriatric Psychology*


July 7, 2026

R. Alex Morris, Esquire
Attorney at Law
Tallahassee, Florida

Dear Mr. Morris:

Please be advised that I have interviewed Mr. Diego Villavicencio at the Federal Detention Center on June 30, 2026, per your request/referral and reviewed all pertinent information related to his case, subsequent detention, and underlying mental health needs/treatment.

Mr. Villavicencio reported he had most recently been arrested for his index offense from September 2025, through January 2026, for charges that included (Counts 1 & 3: Threatening Communication; (Count 2): Threats against Federal Officials; and (Count 4): Threats against the President of the United States. According to his records (Plea Agreement), Mr. Villavicencio voluntarily pled guilty to all counts and signed the plea agreement on April 27, 2026. During the current interview, Mr. Villavicencio advised that he had been arrested in February 2026, and detained in the Federal Detention Center since that time.

**Psychosocial History:**

Family History: Mr. Villavicencio reported being raised by both of his parents in Hernando County, recalling overall a violent and abusive family dynamic. He stated, "*There were times I didn't have a place to stay.*" He further noted a rather contentious relationship with his parent ("*I didn't get along with either of my parents")* as an adolescent, stating how he left home after age 18 (leaving from living with his mother to go with his father and then back to his mother again, who was eventually re-married to his stepfather). Mr. Villavicencio recalled how he witnessed physical violence within his home between both his mother and father, stating that his mother physically abused his father, who he related also physically abused/disciplined Mr. Villavicencio after returning home from working trips. He recalled that the "*beatings stopped around age 10-11,*" and described his upbringing as involving "*indiscriminate disciplining.*" Mr. Villavicencio recalled there being "*a lot of addiction issues (ETOH)*" for both of his parents, stating, "*my mother was a mental case.*" Mr. Villavicencio stated he has one younger brother, now living in New York, and reported a satisfactory with him. Although Mr. Villavicencio acknowledged breaking rules, lying, and stealing, and engaging in somewhat "reckless behavior" with his friends, he denied ever running away from home or being arrested for any misdemeanors as an adolescent.

Education/School Adjustment: Mr. Villavicencio stated how he could not recall much of his early childhood education but noted his memories are mostly from high school. He reported attending Central High School in Brooksville, but did not graduate from there due to his 2008 (sex offense related) arrest, and eventually had to complete his studies and graduate from Nature Coast Technical around 2009-1010. He reported achieving mostly a "C" level in high school and acknowledged that he could "*possibly, absolutely*" have done better academically, stating how he "*had a tendency to seek out companionship, to float with good and bad influences.*" At this point, he revealed, "*I have major self-esteem issues and didn't get much help with that.*" Mr. Villavicencio reported satisfactory relationships with others in school overall, denying drug relationships. He stated he had two (2) *close friends,"* and stated how he "*had never been in a fight.*" He reported rarely getting in trouble at school, occasionally leaving school early, and denied any in school suspensions.

Work History: Mr. Villavicencio advised that after graduating from Nature Coast, he was on house arrest for two (2) years as a result of his VOP on his 2008 offense. He indicated he completed this supervision, which included community service at the local Elks Lodge. After this, Mr. Villavicencio reported how he obtained his medical technologist license in the state of Florida in 2016, and mostly worked in hospitals, medical clinics, and research labs. He described himself as a "reliable" employee, noting how he would show up for work and "*do it right.*" However, he then added, "*But I did not get along with others,*" adding, "*I did not get fired for my job performance, but rather for something that happened with other people.*" Upon further inquiry, Mr. Villavicencio stated how he was "*paranoid at work, and I would talk to myself and others would stare at me.*"

Medical/Mental Health History: Mr. Villavicencio denied any current serious medical issues/conditions for which he is being treated. He denied any substance abuse issues.

He reported first being seen for mental health issues when he was in high school, recalling this coincided with an attempt at suicide by cutting his wrist while living at his mother's house. He recalled how he was then Baker Acted, and released after three (3) days, with no psychotropic regimen prescribed at that time. He further recalled having seen a counselor when he was very young when his parents were divorcing. He reported being diagnosed as having ADHD and being prescribed Ritalin at that time. He stated, "*It didn't work for me,*" so he discontinued this medication regimen. Mr. Villavicencio then noted that ins 2019, he was working at Advent Health, and recalled, "*I was paranoid, and had a psychotic break.*" He stated how he went and saw a psychiatrist and was diagnosed as Bipolar Disorder, Schizoaffective Disorder, and was prescribed "*mood medications and Trazodone.*"

**Testing Interpretation:**

**ACE:** Mr. Villavicencio was administered the Adverse Childhood Experiences in order to ascertain the likelihood of his suffering from a depressive disorder as a result of him experiencing significant childhood abuse and trauma. Research has demonstrated how increasing ACE scores increase the risk of some diseases, social, and emotional problems. The ACE measures ten (10) types of childhood trauma; five (5) which are personal (physical abuse, verbal abuse, sexual abuse, physical neglect, and emotional neglect, and five (5) which are related to other family members (i.e., a parent who's an alcoholic, a mother who's a victim of domestic violence, a family member in jail, a family member diagnosed with a mental illness, and the disappearance of a parent through divorce, death, or abandonment). The higher the ACE score, the higher one's risk of health and social problems. As the ACE score increases, so does the risk of disease, social, and emotional problems. With an ACE score above four (4), things begin to get serious: likelihood of pulmonary lung disease increased by 390%, hepatitis 240%, depression 460%, and attempted suicide 1,220%. It should be noted that during the current interview, Mr. Villavicencio acknowledged that he had attempted suicide while still in high school by "trying to cut (his) wrist," resulting in a 3-day inpatient placement via the Baker Act. He denied that he was given any psychotropic medication regimen at that time for treatment. Additionally, Mr. Villavicencio related how he currently "hates himself," and has contemplated self-harm off-and-on throughout his adulthood. His current score was determined to be: +7.

**MCMI-III:** This instrument is useful  with individuals who are in the early phase of assessment for emotional discomfort or social difficulties. Mr. Villavicencio is seen as a correctional offender (currently detained at Federal Detention Center, Tallahassee). He is reporting how he has recently experienced a problem that includes antisocial behavior (recent criminal charges for which he has already voluntarily pled guilty and is awaiting sentencing). It is noted that his self-reported difficulties, which have occurred for an unspecified timeframe, appear to take the form of **multiple Axis I clinical disorders: Schizoaffective Disorder, Posttraumatic Stress Disorder, and Bipolar Disorder (manic, severe).** Results from his responses also suggest possible diagnoses for **Axis II Personality Disorders: Dependent Personality Disorder, Borderline Personality Disorder, with Avoidant Personality Traits, and Schizotypal Personality Features**.

Mr. Villavicencio's overall response style may indicate a tendency to magnify his illness, an inclination to complain, or feelings of extreme vulnerability associated with his current episode of acute turmoil. While his scale scores may appear somewhat exaggerated, adjustments have been made in the scaling to account for this possibility. Also due to the basis of the test items data, it may be assumed that Mr. Villavicencio is experiencing a severe mental disorder, as indicated in the Axis I clinical disorders noted above.

As Mr. Villavicencio appears needful of affection and security, his frequent depression and dependency appears to demonstrate a sensitivity to what others feel about him. He is likely to overreact to personally disturbing feelings and to avoid unpleasant responsibilities, and he may tend to quickly express his discomfort and fears. In general, he comes across as an easy and cooperative patient in general; however, problems may arise in the area of withdrawal behavior, depressive moods, or even accepting responsibility. Dependency behavior should not be encouraged, and time-limited but supportive therapy focus may prove helpful in changing his attitudes about himself and alleviating aspects of his depressive and anxiety symptoms. Psychiatric referral for consideration of an accompanying psychotropic regimen may also be warranted.

**PCL-R:** This instrument is widely regarded as the gold standard for assessing psychopathy as well as future violence in adults, particularly within forensic populations. It evaluates personality traits and behaviors associated with psychopathy, including superficial charm, manipulativeness, lack of empathy, impulsivity, and antisocial behavior. The assessment is based on a semi-structured interview combined with a review of collateral information such as criminal records, psychiatric reports, and other relevant documentation in order to assist with determination of the individual's match to the "prototypical psychopath." The cutoff score that is used to classify an individual as a psychopath =+30. Results from the face-to-face interview with Mr. Villavicencio at FDC, along with review of collateral information (his records, etc.) resulted in the following scores and percentiles for a male prison/detention center inmate: **Factor 1: Emotional Detachment** − includes superficial charm, manipulativeness, shallow affect, and lack of guilt or empathy. Factor 1=8.8% (Score=+3); **Factor 2: Antisocial Behavior** − includes early behavioral problems, impulsivity, irresponsibility, aggression, and proneness to boredom. Factor 2=11.2% (Score=+6).

Mr. Villavicencio advised that he currently receives no medical services to address any serious medical conditions, and denied that he currently receives any psychiatric services at FDC. Upon further inquiry, he did recall seeing a counselor briefly as a result of him submitting requests to receive treatment and medications to address what he described as previously diagnosed psychiatric disorders (Bipolar disorder and Schizoaffective Disorder). However, he denied being prescribed a psychiatric medication regimen or receiving any further counseling, stating how the mental health clinician advised him that it "will be along time before that will happen."

**Key Points:**

1) Mr. Villavicencio has described his upbringing in a physically as well as verbally abusive household, where he recalls being "indiscriminately disciplined," particularly by his father who he reported physically "beating" him upon his return home. He also reported witnessing severe bouts of physical and verbal violence between his biological parents, noting they both abused substances, i.e., alcohol.

2) He first reported engagement with the mental health community at an early age, after being diagnosed with ADHD and briefly treated with a psychotropic medication regimen (Ritalin), which he recalled “did not work” for him. While in high school, he attempted suicide by cutting his wrist, resulting in him being Baker Acted and evaluated for three (3) days but not being prescribed a psychotropic regimen as a result of this incident. He further reported an incident in 2019 when he recalled becoming “paranoid,” and reported suffering “a psychotic break.” He stated how he went and saw a psychiatrist and was diagnosed as Bipolar Disorder, Schizoaffective Disorder, and was prescribed “*mood medications and Trazodone.*"

3) **It does not appear that since that episode (2019), that Mr. Villavicencio has been followed/treated for his severe mental disorders that have persisted and remain adversely impacting his overall mental health.**

4) He reported attempting to access the mental health sector during his current detention; however, he was advised that this would entail a rather lengthy process for him to receive any services under his current detention. He noted that he had repeatedly requested medications and follow-up for his mental health conditions.

5) Mr. Villavicencio’s records do not appear to identify any arrests or incidents involving physical violence or physical altercations. His charges appear to stem from verbal confrontations as well as internet postings of a threatening nature, for which he currently expresses regret/remorse and current awareness of the harm that may have been incurred as a result of his actions.

6) He denied that the “firearm” (alluded to as an AR-15) pictured in his screens was an actual weapon, noting how it was later determined by local (Leon County Sheriff’s officers) law enforcement to be a toy, and reported his lack of awareness that this item was even in the background during his online presentation.

7) Mr. Villavicencio denied having ever received any documentation that he was referred for a mental health/violence risk evaluation as a result of his confrontation with University of Central Florida, and stated how there was no follow-up for this incident.

Please find this Summary in the hopes that it might assist your client in his case. Thank you for this referral and please do not hesitate to contact me if you require any further information.

Dr. Martin E. Falb, Ph.D.
Licensed Psychologist, FLPY#5471



# Why I Love Daddy!

1) Daddy Likes sweets.

2) Daddy is funny.

3) Daddy Plays with me.

4) I help him with the Pool.

5) daddy buys me cool stuff.

6) daddy helps me with School.

7) daddy makes me laugh.



Virgil 04|23|2026

Dear Daddy,

I Lore you because you are funny like a bunny. and you Like sweets Like me.

Virgil 04/23/2026


virgil + daddy
virgil 04/23/20

Pedro Villavicencio
12337 Newt Ct.
New Port Richey, FL 34654
(352)442-8575

April 23, 2026

The Honorable Allen Winsor
Chief Judge, United States District Court
Northern District of Florida

**Re: United States v. Diego Villavicencio — Character Letter from Father**

Dear Chief Judge Winsor:

My name is Pedro Villavicencio. I am a retired engineer, scientist, and former educator, and I write to you today as the father of Diego Villavicencio. I respectfully ask the Court to consider the following context regarding my son's character and history, with the hope of providing a fuller and more balanced picture of who he is.

As Diego's parent, I fully acknowledge that he has often been his own worst adversary. Diego stands before the Court because of his own actions, and the prosecution is right to bring his conduct before this Court for judgment. I fully respect the seriousness of the offense and the Court's responsibility under the law. However, the government's presentation omits an important dimension of who my son is. Diego has struggled for years with untreated mental-health conditions that significantly affected his judgment and behavior. While this does not excuse his actions, it is an important factor in understanding them. When he is stable, supported, and motivated, he demonstrates responsibility, empathy, and the ability to contribute meaningfully. When untreated, his behavior becomes erratic and self-destructive.

While the prosecution has portrayed him solely through his most harmful moments, I respectfully ask the Court to view his conduct as a manifestation of an untreated mental illness rather than evidence of malice or genuine intent to cause harm. I do not dispute the prosecution's findings regarding Diego's record, online activity, or the consequences that followed, including the freezing of financial stability for his partner, and their young child. Even so, the government's record does not capture the resilience and positive contributions Diego has made despite his profound struggles.

Diego was diagnosed with ADHD in childhood. His support system fractured early in life, leaving him primarily in the care of his mother and stepfather, both of whom faced significant challenges managing his behavior. During that period, he was Baker

Acted multiple times and placed in an alternative education program. Nevertheless, Diego persevered. Looking to his younger brother as a role model, he graduated from that alternative school system; defying the odds imposed by his record Diego applied to college, and was accepted to the University of Central Florida, a great achievement. I supported him throughout that journey, though his erratic behavior persisted. Despite our urging, he refused medication to help stabilize his condition.

During college, Diego and his partner together navigated the challenge of finding housing that would accept tenants with criminal records. Determined to build a stable life, they purchased a home while still in school and in their twenties. Diego earned a degree in microbiology and began raising a family. During the COVID-19 pandemic, he even entered a national inventors' competition with a protective mask design intended for medical personnel. These accomplishments reflect a man who, when grounded and supported, is capable of genuine responsibility and ambition.

Unfortunately, without treatment, Diego continued to make poor decisions, which made it difficult for him to progress in Orlando. He and his partner subsequently relocated their family to Tallahassee, where he purchased another home and secured employment before later being downsized. He gradually distanced himself from me, as he has done from his mother, cutting off contact entirely in 2022. Despite that, I remain ready and willing to support him whenever he is prepared to accept it.

Your Honor, as a father I have seen Diego at his best and at his worst. The behavior that brings him before this Court is not a reflection of who he is when he is stable and receiving appropriate care; it is a reflection of what happens when an untreated mental health condition goes unaddressed for years. A sentence that does not account for his underlying illness would not fully serve justice; it would simply punish a man who has long struggled with a condition he did not understand and was unwilling, or unable, to treat. The greatest risk Diego poses is not to others but to himself.

I respectfully urge the Court to mandate the mental health treatment and structured oversight necessary to give Diego a meaningful opportunity for rehabilitation. When he has been guided by a structured support system and monitored care, he has consistently demonstrated responsibility, empathy, and the capacity to contribute positively to those around him. Such an approach would benefit not only Diego, but society as a whole.

Thank you for your time and for the consideration you extend to this matter.

Respectfully submitted,

Pedro Villavicencio
Father of Diego Villavicencio